UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SEASON L.V.,

                              Plaintiff,                           22-CV-413Sr

v.

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

## DECISION AND ORDER

As set forth In the Standing Order of the Court regarding Social Security Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have consented to the assignment of this case to the undersigned to conduct all proceedings, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g). Dkt. #18.

## BACKGROUND

Plaintiff applied for supplemental security income ("SSI"), benefits with the Social Security Administration ("SSA"), on February 15, 2017, at the age of 38, alleging disability beginning December 1, 2012, due to depression, anxiety, bipolar disorder, psychosis, back pain, sciatica, herniated discs, right wrist pain, thyroid removal, high blood pressure and high cholesterol. Dkt. #6, p.65.

On November 27, 2018, plaintiff appeared with counsel and testified, along with an impartial vocational expert ("VE"), Roxanne Benoit, at an administrative hearing before Administrative Law Judge ("ALJ"), Robin Wright. Dkt. #6, pp.37-55. Plaintiff testified that she was 40 years old with a high school education from an alternative school and vocational training as a medical secretary. Dkt. #6, p.41. She has a driver's license, but does not have a car. Dkt. #6, p.46. She is married, but currently separated, with five children, ages 24, 21, 17, 11 and 10. Dkt. #6, pp.41-42. The youngest three children live with plaintiff in an apartment with two dogs and a cat. Dkt. #6, pp.41, 44 & 46. She gets up in the morning to get her children off to school, then returns to bed until they get home. Dkt. #6, p.45. If she doesn't feel like cooking, they find something to eat. Dkt. #6, p.45. She is usually back in bed by 8:00 pm, but generally only sleeps about three hours a night. Dkt. #6, pp.45 & 54. When she is really depressed, she does not get out of bed for days. Dkt. #6, p.45. Plaintiff explained: "instead of having an attitude and being mean to people, it's just easier for me to stay in bed." Dkt. #6, p.47.

Plaintiff testified that she has had anger issues since sixth grade, including physical altercations and verbal outbursts. Dkt. #6, pp.50-51. She was arrested for stabbing her husband. Dkt. #6, p.51. She doesn't go to the store often, because she feels that people are staring and following her. Dkt. #6, pp.51 & 55. She left her last job because of verbal and physical altercations. Dkt. #6, p.52. Plaintiff explained that she was "not trying to sound like I'm this terrible person," but she just doesn't "have any patience" and gets so overwhelmed. Dkt. #6, p.52. She knows she

has "a problem with people" and doesn't want to go to jail, so she doesn't leave her house. Dkt. #6, pp.51-52. However, her son plays baseball and football and is on the bowling team; plaintiff attends every game. Dkt. #6, pp.47-48.

Plaintiff has been on mental health medication since she was 14. Dkt. #6, p.53. She had her first psychiatric hospitalization when she was 15. Dkt. #6, p.53. When asked if she ever tried to hurt herself, plaintiff recalled the most recent incident[1] was when she "got into a high-speed police chase and tried to get the police to shoot" her. Dkt. #6, p.55. Plaintiff explained that she was tired and the police tried to pull her over for no reason and she "didn't care anymore." Dkt. #6, p.55. Her bipolar manifests primarily as depression, but when she is manic, she stays up for most of a week straight. Dkt. #6, p.53. When asked about triggers, plaintiff responded: "Honestly, your questions are starting to annoy me," explaining that she was exhausted, didn't sleep well and was having nightmares again. Dkt. #6, p.54.

When asked to assume an individual with plaintiff's age, education and past work experience who could perform light exertion work and was limited to simple, routine and low-stress work with only occasional interaction with a supervisor, incidental contact with coworkers and no interaction with the public, the VE testified that plaintiff could not perform her past work but could work as a housekeeper, folder, or sorter,

---

[1] Treatment records from Erie County Medical Center indicate that plaintiff was brought into the Comprehensive Psychiatric Emergency Program ("CPEP"), by the police on March 14, 2016 after she was pulled over for speeding and made statements about hurting herself. Dkt. #6, p.725.

each of which is a light exertion, unskilled position. Dkt. #6, pp.58-59. If the individual was restricted to no contact with coworkers or off task 15% of the work day, that individual would be deemed unemployable. Dkt. #6, p.61.

The ALJ rendered a decision that plaintiff was not disabled on February 7, 2019. Dkt. #6, pp.22-32. The Appeals Council denied review on February 10, 2020. Dkt. #6, p.7. Plaintiff commenced an action seeking review of the Commissioner's final decision on April 10, 2020. 20-CV-429 at Dkt. #1. By Stipulation and Order entered March 15, 2021, the matter was remanded to the Commissioner for further proceedings. 20-CV-429 at Dkt. #61. Specifically, the Appeals Council noted that the ALJ failed to provide any rational for rejecting the opinion of a consultative examiner that plaintiff experienced marked difficulties in at least two areas of mental functioning. Dkt. #6, p.837. The Appeals Council was also concerned that the ALJ determined that plaintiff had been noncompliant with treatment without addressing evidence in the record that plaintiff's ex-husband was physically and emotionally abusive, including refusing to allow her to obtain treatment and flushing her medication down the toilet or considering whether plaintiff's noncompliance was caused by a lack of insight into her mental impairment. Dkt. #6, p.838.

On November 18, 2021, plaintiff appeared with counsel and testified, along with an impartial vocational expert ("VE"), Gabrielle Ficchi, at an administrative hearing conducted telephonically before Administrative Law Judge ("ALJ"), Stephen Cordovani. Dkt. #6, pp.765-807. Plaintiff testified that she was living in an apartment

with her boyfriend and two youngest children, ages 13 and 14. Dkt. #6, p.770-771. Plaintiff drives her boyfriend to work and drives to the grocery store every couple of weeks. Dkt. #6, pp.772-773. She worked part-time for Door Dash and Grub Hub in 2020; she would drive and her boyfriend would go in to get the food and deliver it. Dkt. #6, pp.776-777. She stopped because

> It was just too much. Like, I was just constantly – he wasn't going fast enough for me and I was just getting easily irritated and people are just rude and I started to get really paranoid that people were following me and it was just too much. I . . . just couldn't do it.

Dkt. #6, p.778. When asked why she has been unable to maintain a full-time job, plaintiff explained:

> I have some really good days where . . . I feel, I hate to say normal, but normal and where I . . . have the energy to get up and . . . do things. And then I have other days where I just physically cannot do it. I can't get out of bed and I don't know why. Just I'm exhausted and mentally exhausted. I have anxiety, my panic attacks have been out of control.

Dkt. #6, p.779. She testified that she has nightmares and wakes up "fighting the air and there's nobody there." Dkt. #6, p.780. She has flashbacks of her ex-husband and testified that she is afraid of him coming here because he threatens her constantly. Dkt. #6, p, 779. When she was super manic, she would spend all her money at the casino, but testified that it has been "several months" since she did that. Dkt. #6, p.790. During a manic period in July, she got in her car and drove to New York City and back. Dkt. #6, pp.782-783. As she was driving home, she started to calm down and became irritated, asking, "why the hell did I do this?" Dkt. #6, p.783. By the time she got home, all she could do was sleep and cry, despite telling herself to get up and do something. Dkt. #6, p.783. She "took the police out on a chase sometime in September" because she "just

wanted them to shoot me." Dkt. #6, p.784. The police "busted" the window and pulled plaintiff out of the car. Dkt. #6, p.784. Another time, plaintiff testified that she went walking on the Thruway, "praying to God . . . that a car would just . . . hit me," but the New York State Troopers picked her up and took her to the hospital. Dkt. #6, p.6, pp.784-785.

When asked if she has difficulty controlling her temper when interacting with people, plaintiff explained:

> Sometimes there's certain words that . . . just set me off and [they are] words that my husband would say to me. So . . . if somebody raises their voice to me, I'd go into a defense mode. And at that point, I don't want to say that the gloves come off, but the gloves come off, like, you need to just give me my space. I get so overwhelmed. I'm dizzy. I feel like I'm gonna pass out. And . . . that's why I don't go out often because I just can't. It comes outta nowhere and I feel horrible. I feel so horrible when these people are really trying.
>
> * * *
>
> They're really trying to be compassionate. And I just - I can't accept it. It's horrible. And I'm so sorry. I'm having the worst anxiety right now. Even talking about this. It's hard for me to explain. I actually talked about this with my therapist yesterday 'cause [it's] so hard for me to put into words how I feel.

Dkt. #6, p.785. When asked if she had difficulties with coworkers, plaintiff responded:

> I wasn't trying to purposely defy these people. I'm not this cruel human being. I need you to understand that I'm not trying to hurt people's feelings and I'm not trying to be angry at these people because they've done nothing wrong. They've done nothing.

Dkt. #6, p.786. She also explained that she is

> extremely paranoid. I'm trying to work through that with my therapist right now, because . . . it's so debilitating where I don't even like to go out anymore now. Like if I see you in one aisle and when I see you in another aisle, like, why are you following me? And they're probably not following me, but you're in the same aisle. Like . . . go to another aisle . . . just go away from me. So, I try to limit . . . when I go out because I don't want everybody to just feel the wrath of me being angry. And I know they're just shopping, but you're following me. Get away – just leave me – just go away – go away. So, I just leave. There's been times I've just left my entire cart and just walked out.

Dkt. #6, pp.786-787.

Plaintiff testified that she was seeing a therapist who was "amazing" and had just started seeing a nurse practitioner who was working to find the correct "cocktail" of medications for her. Dkt. #6, p.787. She explained:

> So, my meds have just again, been changed again, and increased and added and like she just increased . . . my clonidine. She increased my Clonodine because my anxiety has been through the roof and she increased my mood stabilizer. She put me [on] another mood stabilizer and she wants to take me off one blood pressure pill because there's another one that helps with panic symptoms, because I have the chest pains and . . . my limbs go numb and then I feel like I'm having a heart attack. . . . So, I've just been kind of in limbo figuring out which medication is gonna work for me. And it sucks. I'm sorry. It sucks.

Dkt. #6, p.787. Plaintiff had tried group therapy, but was "kicked out," explaining, "this is gonna make me sound so mean," but there was a girl in group who "got slapped by her boyfriend and she made it like this really big deal" and plaintiff compared that experience to her own experience and

> was asked not to come back because they said I didn't have empathy. But I do have empathy, but you were slapped. I - I

> went through that for 18 years. That slap is nothing. So, I'm asked not to come back.

Dkt. #6, p.788. When she is depressed, plaintiff testified that it physically hurts her to get out of bed; she has had to shave her head because her hair got so matted from lying in bed. Dkt. #6, p.789.

When asked to assume an individual with plaintiff's age, education and past work experience who was able to work at any level of exertion but should avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation and other respiratory irritants, with no exposure to extreme wetness or humidity, who could understand, remember and carry out simple instructions and tasks and work in a low stress work environment with no supervisory duties, independent decision making, goal setting, strict production quotas and no more than minimal changes in work routines and processes with occasional interaction with supervisors and coworkers but no more than incidental interaction with the general public, the VE testified that the number of jobs available "are very limited." Dkt. #6, p.801. The VE suggested industrial cleaner, hospital cleaner or industrial sweeper, each of which were unskilled, medium exertion positions Dkt. #6, p.802. If the individual was off task more than 10% of the work day, that individual would be deemed unemployable. Dkt. #6, p.803.

The ALJ rendered a decision that plaintiff was not disabled on January 21, 2022. Dkt. #6, pp.733-757. Plaintiff commenced this action seeking review of the Commissioner's final decision on May 31, 2022. Dkt. #1.

**DISCUSSION AND ANALYSIS**

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.905(a). The Commissioner must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920(a). At step one, the claimant must demonstrate that she is not engaging in substantial gainful activity. 20 C.F.R. § 416.920(b). At step two, the claimant must demonstrate that she has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related

activities. 20 C.F.R. § 416.920(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 416.920(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner considers whether the claimant has sufficient Residual Functional Capacity ("RFC"), for the claimant to return to past relevant work. 20 C.F.R. § 416.920(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that she could perform other jobs which exist in significant numbers in the national economy, based on claimant's age, education and work experience. 20 C.F.R. § 416.920(g).

In the instant case, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful activity since the date of her application on February 15, 2017; (2) plaintiff's obesity, degenerative disc disease of the cervical and lumbar spine, bipolar disorder, generalized anxiety disorder, major depressive disorder, personality disorder/antisocial disorder and asthma constitute severe impairments; (3) plaintiff's impairments did not meet or equal any listed impairment; (4) plaintiff retained the RFC to perform medium work except that she must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants with no exposure to wetness or humidity and must work in a low stress work environment where she is limited to simple instructions and tasks, with no supervisory duties, independent decision-making, goal setting, or strict production quotas with minimal changes in work routine and processes

and was limited to simple, unskilled work with no more than occasional interaction with supervisors and coworkers and no more than incidental interaction with the public; and (5) plaintiff was capable of working as an industrial cleaner, hospital cleaner, industrial sweeper or store laborer, which are medium exertion, unskilled positions, and was not, therefore, disabled within the meaning of the SSA. Dkt. #6, pp.736-756.

Plaintiff argues that the ALJ erred by affording significant weight to Dr. Ippolito's opinion suggesting moderate limitations in plaintiff's ability to sustain an ordinary routine and regular attendance at work but failing to incorporate those limitations into plaintiff's RFC or reconcile them with the VE's testimony regarding permissible time off task or absent. Dkt. #10-1, pp.15-17. Plaintiff also argues that the ALJ improperly rejected the portion of Dr. Ippolito's opinion that plaintiff had marked limitations interacting adequately with supervisors, coworkers and the public and with regulating emotions, controlling behavior and maintaining well-being. Dkt. #10-1, pp.18-19. Specifically, plaintiff argues that it was error for the ALJ to cherry pick normal mental status examinations while ignoring or discounting abnormal mental status examinations. Dkt. #10-1, pp.19-20. Furthermore, plaintiff argues that the ALJ improperly emphasized plaintiff's activities of daily living, which fail to establish a capacity to engage in substantial gainful activity. Dkt. #10-1, pp.20-21. Finally, plaintiff argues that it was error for the ALJ to discount Dr. Ippolito's opinion of marked limitations based upon the ALJ's assessment that plaintiff's emotional distress was commonly caused by a situational stressor. Dkt. #10-1, p.21.

The Commissioner argues that the ALJ's RFC determination is supported by substantial evidence and that the ALJ properly evaluated the medical opinion evidence, provided sufficient explanation for discounting certain opinions, and adequately accounted for mental limitations supported by the record in plaintiff's RFC . Dkt. #14-1, pp.8-22.

Plaintiff underwent a consultative psychiatric evaluation with Janine Ippolito, Psy.D., on May 11, 2017. Dkt. #6, pp.529-534. Dr. Ippolito noted that plaintiff

> was observed to have a significant angry outburst in the waiting room prior to today's evaluation. She reports that she became agitated with another claimant for making noises while she was trying to fill out her paperwork. The [plaintiff] showed no remorse for her behavior towards the other claimant and when told that the other claimant was very upset over the incident, the [plaintiff] stated, "I don't give a fuck."

Dkt. #6, p.530. Plaintiff reported that she had been arrested around 2006 for assaulting a woman with a baseball bat, reporting, "she deserved it" and that she was also arrested in 2015 for a domestic dispute where she "sliced her husband with a razor blade." Dkt. #6, p.531. Dr. Ippolito recounted that medical records (Dkt. #6, pp.719-721), indicated that plaintiff was admitted to ECMC for a psychiatric evaluation in November of 2016 "for sleepwalking and perseverating on a story about Al Pacino getting on a plane that went up and never came down" and that her mental status examination at ECMC indicated that plaintiff was "agitated, irritable, speech was rambling and disorganized, and thoughts marked by delusional content." Dkt. #6, p.531.

Dr. Ippolito noted that plaintiff "appeared agitated and tense throughout today's evaluation, shaking her leg while in her seat" and "appeared to lack insight into her psychiatric conditions." Dkt. #6, pp.530-531. Dr. Ippolito's mental status examination observed that plaintiff was irritable, with a tense posture, restless motor behavior, agitated and irritated affect, and poor insight and judgment. Dkt. #6, p.532. Dr. Ippolito opined that plaintiff

> presents as able to understand, remember, or apply simple and complex directions and instructions; sustain concentration and perform a task at a consistent pace; and maintain personal hygiene and appropriate attire with no evidence of limitation. She can use reason and judgment to make work-related decisions; sustain an ordinary routine and regular attendance at work; and demonstrate awareness of normal hazards and take appropriate precautions with moderate limitations. She can interact adequately with supervisors, coworkers and the public and regulate emotions, control behavior and maintain well-being with marked limitations. These limitations are due to her emotional distress.

Dkt. #6, p.533. Dr. Ippolito opined that the results of the evaluation "appear to be consistent with psychiatric problems, and this may significantly interfere with the [plaintiff's] ability to function on a daily basis." Dkt. #6, p.533. Dr. Ippolito opined that plaintiff's prognosis was guarded and that she was not able to manage her own funds due to her psychiatric conditions. Dkt. #6, p.534.

ALJ Cordovani recognized that ALJ Wright afforded Dr. Ippolito's opinion significant weight but failed to incorporate marked limitations for interacting with others. Dkt. #6, p.753. ALJ Cordovani stated that he had "looked at the medical evidence at the time of that prior decision and the updated evidence since then and noted several

-13-

inconsistencies in the [plaintiff's] subjective complaints and reported activities." Dkt. #6, p.753. After reviewing all the evidence, including the [plaintiff's] reported activities," ALJ Cordovani gave Dr. Ippolito's opinion partial weight." Dkt. #6, p.753. More specifically, ALJ Cordovani

> gave significant weight to all aspects of Dr. Ippolito's opinion except for the marked limitations assessed in the areas of interaction, regulating emotions etc. For those areas, I give Dr. Ippolito's opinion little weight to the level of impairment assessed. The type of limitations assessed by Dr. Ippolito are consistent with the [plaintiff's] subjective complaints; however, the severity of those limitations are not consistent with the mental status examinations, which were generally within normal limits other than her mood and affect, or her admitted activities, which included cooking, cleaning, driving, shopping in stores, taking the bus, socializing with family and friends several times per week, going to the casino, taking trips with her partner and children, [and] working part-time for Diner Dash and Grub Hub. The record shows that the various times the [plaintiff] was emotionally distraught usually centered around a situational stressor. I relied more on Drs. Tzetzo's and Cervantes opinions when determining her residual functional capacity because they were consistent with the [plaintiff's] subjective complaints, mental status examinations, and activities as a whole.

Dkt. #6, p.753. As a result, ALJ Cordovani determined that plaintiff's limitation for interacting with others and for adapting or managing herself was moderate. Dkt. #6, pp.738 & 740. This determination is determinative, as a finding that plaintiff was markedly limited in these two areas of functioning would meet the paragraph B criteria for affective and anxiety disorders, warranting a finding of disability. *See Kelli F. v. Kijakazi,* 22-CV-727, 2023 WL 4194866, at *2 (W.D.N.Y. June 27, 2023) (ALJ's determination that plaintiff's post-traumatic stress disorder, generalized anxiety disorder, and bipolar disorder were severe impairments satisfies the criteria for paragraph A).

The ALJ's reasons for discounting Dr. Ippolito's opinion are not supported by substantial evidence. Dr. Tzetzo did not examine plaintiff and rendered his opinion on May 26, 2017, prior to the development of a longitudinal mental health record. Although Dr. Cervantes provided psychiatric treatment to plaintiff for ten months and her final appointment with plaintiff in August of 2017 noted that medication had resolved plaintiff's nightmares and that she was feeling better, Dr. Cervantes observed that plaintiff presented with an anxious affect and appeared "highly anxious, and restless, with her leg tapping constantly during the appointment." Dkt. #6, pp. 678-679. Moreover, as the ALJ noted later in his decision, Dr. Cervante's opinion that plaintiff was moderately limited in her ability to interact appropriately with others, maintain socially appropriate behavior without exhibiting behavior extremes, and ability to function in a work setting at a consistent pace (Dkt. #7, p.287), was provided for the New York State Office of Temporary and Disability Assistance, which utilizes different standards and did not define moderate on their Medical Examination for Employability Assessment, Disability Screening, and Alcohoism/Drug Addiction Determination form. Dkt. #6, p.754. It is inconsistent for the ALJ to state that such an assessment is of "little probative weight" (Dkt. #6, p.751), and also rely upon it to undermine Dr. Ippolito's opinion. Dkt. #7, p.753.

In any event, within a month of that assessment, on August 23, 2017, plaintiff reported that the medication for her nightmares stopped working and was observed by Dr. Belen to have a constricted affect with moderate irritability and reported high anxiety. Dkt. #6, pp.673 & 676.

Plaintiff subsequently returned to mental health treatment on July 5, 2018 to get back on a medication regime after 6 months without medication because her symptoms had worsened since she separated from her husband six months prior. Dkt. #6, pp.689 & 691. She reported "symptoms of anxiety, depression, severe mood swings, irritability, nightmares, flashbacks, paranoia . . . feeling people are following her . . . racing thoughts, and feelings of lightheadedness. Dkt. #6, p.691. She was tearful and trembling during the intake interview. Dkt. #6, p.693.

On January 11, 2019, plaintiff reported improvement in her symptoms and that she was feeling well on her medications, but on April 5, 2019, plaintiff reported that she had been absent from treatment due to heightened depressive symptoms. Dkt. #6, pp.1007 & 1010. Plaintiff's PHQ-9 indicated severe depression. Dkt. #6, p.984. Subsequent mental health treatment records indicate that plaintiff "attended group therapy briefly but it was determined she was not ready for that level of social interaction without harm to other clients." Dkt. #6, p.989. She was discharged from treatment on May 28, 2019. Dkt. #6, p.991. On December 10, 2019, her primary care physician noted that plaintiff "looks very anxious and is constantly crying." Dkt. #7, p.212.

Screening indicated severe anxiety and moderately severe depression on December 4, 2020. Dkt. #7, pp.123 & 131. LCSW Kathleen Lisborg noted at that time that plaintiff's mental status evaluation findings support a diagnosis of PTSD in that she "was activated by any discussion [of] her past, even in identifying symptoms, she was rocking during sessions and tearful." Dkt. #7, p.144.

Plaintiff reported to the emergency room with complaints of constipation and abdominal pain on January 31, 2021 and was noted to be anxious. Dkt. #6, pp.1113 & 1116. Plaintiff reported to the emergency room for chest pain and shortness of breath which were determined to be suggestive of anxiety on March 21, 2021. Dkt. #6, p.1112. On May 7, 2021, plaintiff reported that her nightmares were getting progressively worse and that she recently thought her bed was on fire. Dkt. #7, p.451. Her primary care provider noted that plaintiff was depressed and tearful at her annual exam on June 23, 2021. Dkt. #6, p.329.

On September 15, 2021, plaintiff underwent a consultative examination with Susan Santarpia, Ph.D., who noted plaintiff was waiting to be assigned a new counselor and reported that she needed to get back into treatment and take it seriously. Dkt. #7, p.261. Plaintiff's mood was reported as euthymic and she was noted to have fair insight and judgment. Dkt. #7, p.262. Dr. Santarpia opined that because of her noncompliance with consistent treatment, plaintiff would be mildly impaired in her ability to interact adequately with supervisors, coworkers and the public and to regulate her emotions, control her behavior and maintain her well being. Dkt. #7, p.263. Her prognosis was guarded. Dkt. #7, p.263. The ALJ afforded this opinion some weight, but determined that the totality of the treatment record supported greater limitations, particularly with respect to plaintiff's ability to handle stress. Dkt. #6, p.754.

On September 16, 2021, one day after plaintiff's consultative evaluation with Dr. Santarpia, plaintiff's PHQ-9 continued to indicate moderately severe depression

and plaintiff reported that she got into a fight with her son which triggered feeling like "nothing mattered anymore." Dkt. #7, pp.399 & 401. Her mental status examination indicated that she was restless, annoyed, depressed, irritable, anxious and tense. Dkt. #7, p.413. On September 21, 2021, plaintiff presented as "visibly angry and sometimes tearful." Dkt. #7, p.442. On September 27, 2021, plaintiff reported that "she was tired of being tired, her mood was stuck, and that she hadn't "had mania and I miss it so much." Dkt. #7, p.450. She reported that she has been irritable and on edge and had screamed at her counselor during a recent counseling session, which she felt very upset about and caused her to cry. Dkt. #7, p.450. On October 14, 2021, plaintiff presented as agitated and tearful, reporting that her symptoms were getting worse, but she was paranoid about taking her medication. Dkt. #7, p.492. On October 21, 2021, plaintiff presented as agitated and reported that "yesterday she got in a fist fight 'defending her best friend from one of her neighbors.'" Dkt. #7, p.486.

Contrary to the ALJ's assessment that the various times that plaintiff was emotionally distraught usually centered around a situational stressor, plaintiff's mental health records consistently demonstrate significant symptoms of mental impairment regardless of temporal circumstances. Moreover, although plaintiff was not always consistent with treatment, her symptoms remained significant even when she was in treatment, as evidenced by ongoing adjustments to plaintiff's medications. In any event, despite the instruction of the Appeals Council to consider whether noncompliance with treatment recommendations may have been caused by the mental impairment itself, the ALJ did not address numerous suggestions within the record that plaintiff lacked insight

-18-

into her illness and expressed fear of medication. *See Tammy P. v. Comm'r of Soc. Sec.*, 19-CV-1313, 2021 WL 567149, at *4 (W.D.N.Y. Feb. 16, 2021) ("In the mental health context, courts have observed that faulting a person with a diagnosed mental illness for failing to pursue mental health treatment is a questionable practice.") (internal quotation omitted); S.S.R. 96-7p, 1996 WL 374186, at *7 (S.S.A. July 2, 1996) (ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

Finally, the Court notes that the ALJ's recitation of plaintiff's activities of daily living are not wholly accurate and fail to support a determination that plaintiff was capable of engaging in substantial gainful activity. For example, although the ALJ states that plaintiff "acknowledged that she worked part time in 2020 and 2021 for both Grub Hub and Door Dash and her only significant problem was that she messed up orders and went to the wrong addresses because she had a hard time following step-by-step instructions . . . and stopped because she was not going fast enough for herself and was easily irritated when people were rude," plaintiff's testimony was that even though her boyfriend would go in to get the food and deliver it while she drove, she still couldn't continue driving because she was getting irritated with her boyfriend and the rudeness of customers and was getting "really paranoid" that people were following her. Dkt. #6, pp.776-778. Moreover, testimony that plaintiff spent all her money at the casino (Dkt. #6,

-19-

p.790), and drove her car to New York City and back (Dkt. #6, pp.782-783), when she was manic fails to undermine Dr. Ippolito's assessment of the severity of plaintiff's ability to mange herself.

In sum, the Court finds that Dr. Ippolito's opinion that plaintiff suffers a marked limitation in her ability to interact with others and adapt or manage herself is both consistent with and supported by the evidence of record, warranting a finding of disability. *See, e.g., Lacherie C. v. Kijakazi*, 20-CV-1212, 2022 WL 2948977, at *10 (W.D.N.Y. July 26, 2022) (finding plaintiff disabled where substantial evidence established marked limitations regarding adaptive functioning area of interacting with others and managing or adapting oneself).

## CONCLUSION

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #9), is granted and this matter is remanded for the calculation of benefits, and the Commissioner's motion for judgment on the pleadings (Dkt. #11), is denied.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**DATED:**   **Buffalo, New York**
             **March 31, 2025**

       **s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**